OPINION
{¶ 1} Defendant-appellant Willie J. Span appeals from his conviction and sentence on two counts of Forgery. Span contends that his trial counsel was ineffective, that the trial court erred in a number of evidentiary rulings, that the trial court erred in rulings with respect to his objections to statements made by the prosecutor in closing argument, and that the trial court erred with respect to one preliminary instruction given to the jury. We conclude that the alleged deficiencies of Span's trial counsel either did not constitute ineffective assistance of counsel, or were of insufficient consequence to have deprived Span of a fair trial, that the trial court's misstatement during a preliminary instruction was insufficiently prejudicial, especially in view of the fact that the instruction was correctly given to the jury at the end of the case, both orally and in writing. We further conclude that the trial court did not err in its evidentiary rulings, and did not err in its rulings with respect to Span's objections made during the course of the State's closing argument. Accordingly, the judgment of the trial court is affirmed.
 I {¶ 2} Span, who testified, stipulated that he cashed two checks drawn on the account of Comdata, known as "Comcheks." The first check was given to Dave's World on April 26, 2002, for value. The second check was given to Valley Street Market on May 12, 2002, for value.
 {¶ 3} It is undisputed that both checks were forgeries. Span, who testified, took the position that he was a victim of the forgeries, having received both checks as payment for his services assisting a truck driver with loading and unloading a truck. The State took the position that Span was lying — that he had forged the checks. A jury found Span guilty on both counts.
 {¶ 4} From his conviction and sentence, Span appeals.
 II {¶ 5} Span's First Assignment of Error is as follows:
 {¶ 6} "Appellant was deprived of his sixth amendment right to effective assistance of counsel."
 {¶ 7} Reversal of a conviction on grounds of ineffective assistance of trial counsel requires a showing that counsel's performance was deficient, and that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. State v. Cassano,96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, at ¶ 105. It must be shown that there is a reasonable probability that, but for trial counsel's errors, the result of the trial would have been different. Id., at ¶ 108.
 A {¶ 8} Span first contends that his trial counsel was ineffective for having failed to object to, and having failed to move to strike, the following testimony from the witness Muhammed Ali Kahn, the proprietor of the Valley Street Market, who cashed one of the two forged checks:
 {¶ 9} "Q. After you cashed the check and you give him the cash, what does the defendant do?
 {¶ 10} "A. He took the cash and he left.
 {¶ 11} "Q. What did you do?
 {¶ 12} "A. Oh, what I did, to be honest with you, I did call that number that he gave to me, my home number and this and that. Momentally [sic], when he walked out, somehow I call that number. It was disconnected. I ran after him and he was in the car. I saw his car. I did not want to confront him because I thought he will run me over with the car. The best is to call the law and let them take care of it."
 {¶ 13} The State did not elicit Kahn's testimony concerning his fears that Span would run him over. The State did not follow up on this statement, and did not refer to it in argument.
 {¶ 14} Kahn appears to have offered this part of his statement by way of explaining why he did not seek a confrontation with Span after Kahn discovered that the telephone number he had been given was disconnected. For that limited purpose, the testimony was relevant.
 {¶ 15} Span's trial counsel might have argued, in moving to strike the testimony that Kahn had already given, that its unfair prejudicial impact outweighed its probative value. Alternatively, Span's trial counsel might have sought a limiting instruction from the judge. In our view, Span's trial counsel could reasonably have decided that it would be better not to emphasize Kahn's statement concerning his fear that Span might run him over. Kahn did not provide any basis for concluding that Span intended to run him over. In context, Kahn's statement appears to be nothing more than an expression of concern that Span, had he been confronted, might have decided to run Kahn over, by way of explaining why Kahn chose not to confront Span.
 {¶ 16} We conclude that trial counsel was not deficient in having failed to move to strike this part of Kahn's testimony, and that trial counsel's failure to move to strike this part of Kahn's testimony, even if it were deemed deficient, is not likely to have affected the outcome of the trial.
 B {¶ 17} Span next refers to an exchange between his trial counsel and Charles Plante, Vice-President of Operations and General Manager of Calvin Tawney Movers, an agent of United Van Lines.
 {¶ 18} Span claimed that on two occasions, shortly before he cashed each of the forged checks, he had assisted a truck driver, known to him only as "Paul," who was driving a United Van Lines trailer. Span claimed that this driver, on each of those occasions, paid him with the Comchek that he then cashed.
 {¶ 19} During his direct testimony, Plante testified as follows:
 {¶ 20} "Q. Do your drivers hire their own independent contractors to assist them?
 {¶ 21} "A. In what way?
 {¶ 22} "Q. Help them move.
 {¶ 23} "A. Possibly to help unload or load a truck, yes.
 {¶ 24} "Q. And how would they get paid?
 {¶ 25} "A. Cash.
 {¶ 26} "Q. Are your drivers authorized to issue checks?
 {¶ 27} "A. No.
 {¶ 28} "Q. Are you familiar with what is called a Comchek?
 {¶ 29} "A. Yes, ma'am.
 {¶ 30} "Q. Does your company use Comcheks?
 {¶ 31} "A. No.
 {¶ 32} "Q. Mr. Plante, I'm going to show you what's been marked as State's Exhibit 3 for identification purposes. If you can refer your attention to State's Exhibit 3, do you know what this is? Do you recognize it?
 {¶ 33} "A. It's a Comchek.
 {¶ 34} "Q. All right. And did your company prepare this Comchek?
 {¶ 35} "A. No.
 {¶ 36} "Q. Does United Van Lines issue Comcheks, do you know?
 {¶ 37} "A. Not that I know or ever heard of.
 {¶ 38} ". . . .
 {¶ 39} "Q. And on both State's Exhibit 3 and State's Exhibit 4, there is a typewritten name Willie Span in the Pay To The Order Of line. Are you aware of your company paying Willie Span.?
 {¶ 40} "A. No, my company never paid Willie Span for anything.
 {¶ 41} "Q. Would have any of your drivers issued checks like that to Willie Span?
 {¶ 42} "MR. LEWIS: Objection.
 {¶ 43} "THE COURT: The objection is sustained.
 {¶ 44} "BY MS. DROESSLER:
 {¶ 45} "Q. Are you aware of whether any of your drivers would authorize checks like that?
 {¶ 46} "MR. LEWIS: Objection.
 {¶ 47} "THE COURT: Overruled. If you are aware, sir, of whether or not your drivers ever issued such a check.
 {¶ 48} "THE WITNESS: I am not aware of my drivers ever issuing such a check."
 {¶ 49} Plante was then cross-examined, as follows:
 {¶ 50} "Q. Mr. Plante, does Calvin Tawney Movers, do they employ owner-operators?
 {¶ 51} "A. We have, yes.
 {¶ 52} "Q. You have? Do you presently have any owner-operators?
 {¶ 53} "A. Not right now.
 {¶ 54} "Q. Okay. Are you aware of whether or not owner-operators use Comcheks?
 {¶ 55} "A. I doubt that any of our owner-operators would have."
 {¶ 56} Span contends that the last answer quoted above is speculative and prejudicial, so that trial counsel was deficient for having failed to move to have this answer stricken. First of all, the answer "I doubt that any of our owner-operators would have," is reasonably responsive to the question, "are you aware of whether or not owner-operators use Comcheks?" Without any follow-up to the response given, a reasonable juror might have construed Plante's answer as amounting to nothing more than the response, "not that I am aware of."
 {¶ 57} As the State points out, there is no evidence that the driver, "Paul," who allegedly gave Span the forged checks, worked for Calvin Tawney Movers. In short, we conclude that the testimony of which Span complains was of very little consequence, and it was reasonable trial strategy for defense counsel to ignore it, and proceed immediately to another subject, which he did.
 C {¶ 58} Span next contends that his trial counsel was ineffective by having failed to move to strike certain testimony given by Howard Chapman, a local operations manager for Planes, Inc., also an agent of United Van Lines. Significantly, Chapman testified that some of his company's drivers do pay helpers with Comcheks, thereby taking the sting out of Plante's testimony that he doubted that any of his company's owner-operators would have used Comcheks, since, if the jury believed that Span received the forged checks from the driver, "Paul," the jury may have believed that Paul was a driver for Planes, Inc.
 {¶ 59} The exchange giving rise to this claim of ineffective assistance of counsel occurred during Chapman's direct testimony, and began as follows:
 {¶ 60} "Q. Mr. Chapman, in State's Exhibit 4, did your company issue this check?
 {¶ 61} "A. No.
 {¶ 62} "Q. Did your company issue this check to Willie Span?
 {¶ 63} "A. No, ma'am.
 {¶ 64} "Q. Has Willie Span ever worked for your company?
 {¶ 65} "A. No, ma'am.
 {¶ 66} "Q. Has he ever, to your knowledge, received any monies from your company?
 {¶ 67} "A. Not to my knowledge.
 {¶ 68} "Q. And are you aware of whether or not any of your independent contractors would have issued these checks to Willie Span?
 {¶ 69} "MR. LEWIS: Objection.
 {¶ 70} "THE COURT: Overruled. If you are aware, sir, whether that was done.
 {¶ 71} "THE WITNESS: I would say in my dealings with our independent contractors, they would not type out a check like that. We have over 200 van operators in our system and, to my knowledge, in 16 years, I've never seen one of them type out a Comchek like that. They're all usually handwritten.
 {¶ 72} "MR. LEWIS: I'm going to move to strike.
 {¶ 73} "THE COURT: The motion to strike is granted.
 {¶ 74} "The question, sir, is not whether you think they would or wouldn't . But in your 16 years, do you know whether or not a check like this was issued?
 {¶ 75} "THE WITNESS: Well, if I could look at the date on the check — it's a 2002 check.
 {¶ 76} "THE COURT: Yes, sir.
 {¶ 77} "THE WITNESS: I would be willing to say no, none of our contractors paid this gentleman with that check."
 {¶ 78} Span contends that his trial counsel was ineffective for having failed to move to strike Chapman's final response quoted above, as being speculative, since there is no apparent basis shown in the record for Chapman to have known whether his contractors would have typed the Comchek.
 {¶ 79} The presumption is that licensed trial counsel is effective.State v. Cassano, supra. In the entire exchange quoted above, Span's trial counsel succeeded in eliciting the support of the trial court for the proposition that the question was not whether Chapman thought that his operators would or would not issue a typed Comchek, but whether or not a typed Comchek was issued. The witness then wanted to verify the date on the check, and only after verifying that it was 2002 check, was the witness willing to commit himself that none of his independent contractors had paid Span with that check. Competent trial counsel may reasonably have feared that any effort to challenge Chapman's foundation for making that claim would backfire. Competent defense counsel would be likely to have concluded that there was something about the fact that the check was issued in 2002 that permitted Chapman to assert, with confidence, that none of his contractors had paid Span with a typed Comchek, since Chapman evidently found significance in the fact that the check had been issued in 2002. Pursuing the matter would run the risk of laying out for the benefit of the jury Chapman's basis for making that statement. Competent defense counsel may have concluded that it was better to leave the testimony as it stood, especially since the trial court had clarified for the jury that the issue was that of Chapman's knowledge, not what he thought.
 D {¶ 80} In its preliminary instructions to the jury, before opening statements, the trial court included the following statement:
 {¶ 81} "A criminal case begins with the filing of this charge that I just read. It's called the indictment. The indictment informs the defendant that he has been charged with an offense. The fact that it was filed and served on him may not be served for any other purpose. The pleas of not guilty which the defendant has entered are a denial of the charges and puts the responsibility on the State to prove its case." (Emphasis added.)
 {¶ 82} Span contends that his trial counsel was ineffective for having failed to object to this instruction, based upon the trial court's evident misstatement when it recited that the indictment could not be "served" for any other purpose.
 {¶ 83} In its concluding instructions to the jury, given immediately before deliberations, the trial court included the following statement:
 {¶ 84} "A criminal case begins with an indictment which is simply the formal charge. The indictment informs the defendant that he has been charged with an offense and may not be considered for any other purpose. The pleas of not guilty which the defendant has entered are a denial of the charges and puts the responsibility on the State to prove the charges in the indictment."
 {¶ 85} These instructions were also provided in writing to the jury for its deliberations. We conclude that the reason defense counsel did not object to the misstatement in the trial court's original, preliminary instructions, is most likely because defense counsel, along with everyone else in the courtroom, understood that the trial judge had simply misspoken when he uttered the word "served" instead of the word "considered." We deem it unlikely, in the extreme, that this misstatement affected the outcome of the case.
 E {¶ 86} Span next contends that his trial counsel was ineffective in having failed to object to the admission in evidence of the check cashed at the Valley Street Market, based on an alleged deficiency in the proven chain of custody of the check. This could not have possibly prejudiced Span, since he stipulated that he cashed the check that was presented at the Valley Street Market. Presumably, this fact was stipulated because Span did, in fact, cash that check. Again, Span did not deny having cashed the forged checks. It was his position that the checks had been forged by the driver, so that he, Span, was as much a victim of the forgery as the two establishments that cashed the checks for him.
 F {¶ 87} Finally, Span contends that his trial counsel was ineffective for having failed to object to testimony of Lisa Curtis that: "When I asked Inquiry to criss-cross the address [shown on one of the checks for the person cashing the check], they told me that there was no such address."
 {¶ 88} Again, the presumption is that trial counsel is competent. There would be no point in objecting to this hearsay testimony if, in fact, the address shown on the back of the check was an invalid address. Presumably, trial counsel, having ascertained that the address was, in fact, invalid, saw no point in belaboring that fact for the jury, since the State could be expected to find alternative means of establishing the invalidity of the address.
 {¶ 89} Span's First Assignment of Error is overruled.
 III {¶ 90} Span's Second Assignment of Error is as follows:
 {¶ 91} "Appellant was deprived of due process and a fair trial through the trial court's erroneous evidentiary rulings."
 A {¶ 92} Span complains concerning the manner in which the trial court handled a stack of documents that was presented to him during his cross-examination. When Span's trial counsel was handed these documents, he immediately objected on the ground that he had not previously been provided copies of them. The prosecutor informed the trial court that she was not aware of these documents either, until one of the State's witnesses was leaving the courtroom after testifying.
 {¶ 93} These documents were never, in fact, admitted in evidence. It appears that they may have been facsimile copies of Comcheks Span had previously received, which the State was offering to show that Span could be expected to have had a greater familiarity with Comcheks than he purported to have had.
 {¶ 94} The following colloquy concerning these documents is worth setting forth in detail:
 {¶ 95} "THE COURT: Miss Droessler?
 {¶ 96} "MS. DROESSLER: First of all, Your Honor, the state was not aware that Mr. Span was going to testify probably until yesterday and what his testimony would be. The State was not aware of that as he did not speak with the officers. We have no statements from him indicating what potential testimony we would have.
 {¶ 97} "He took the stand and upon cross-examination, I asked him how many checks he's received. He indicated maybe four or five. I now acknowledge that there was obviously more than four or five in the year 2002 and I wanted to get an accurate amount.
 {¶ 98} "I think this isn't prejudicial. It's appropriate impeachment for that matter. I can ask Mr. Span about whether he received these checks, and I believe it's very appropriate in this case because he's claiming his knowledge of the — of these checks being fraudulent, that is the crux of his case. This goes to his knowledge, him receiving over 30 checks in the same manner, the same numbers, the same identification numbers, some of them different checks on the same days.
 {¶ 99} "It's very probative of his knowledge of whether or not these are fraudulent checks. How they're issued to him is appropriate impeachment. And that's fine if you're not allowing me to admit them into evidence. I'm asking to use them for impeachment purposes.
 {¶ 100} "THE COURT: To show the number he got, or also to show that he knew that these two were fraudulent because all those others are fraudulent?
 {¶ 101} "MS. DROESSLER: Your Honor, it goes to his entire knowledge of this type of system, the Comchek system. He — it goes to show that these two checks are, in fact, fraudulent because the nature of these checks, the dates that they were issued, receiving four of the same checks on the same date, it goes to his knowledge. And I think —
 {¶ 102} "THE COURT: Because those others are fraudulent.
 {¶ 103} "MS. DROESSLER: Whether they're fraudulent or not, that's going to be up to the jury to decide. Whether these are fraudulent isn't going to be an issue. I think it goes to the weight that he's receiving four checks, some of them in hundred, one thousand dollars, 1500 dollars on the same day, different checks. It goes to the weight of this evidence on whether or not he had knowledge of these being forged — those two being forged checks.
 {¶ 104} "MR. LEWIS: May I respond, Judge?
 {¶ 105} "THE COURT: And why were they just received and produced to the defendant today?
 {¶ 106} "MS. DROESSLER: Well, I never had them, first of all, Your Honor. And it wasn't until after speaking with Mr. Bateman after the close of the State's case, he indicated to me that `if Mr. Span is claiming he's not aware of his knowledge on this, we have numerous — over 30 checks that he did receive that were returned back to them insufficient or invalid.'
 {¶ 107} "And I'm not going to purport that these are either invalid or valid. This defendant sat there on the stand and gave information, rather vaguely, to the State upon cross-examination. I think this is valid impeachment as to his knowledge.
 {¶ 108} "THE COURT: That's where I'm getting confused. Is the impeachment concerning the number of checks he received or is the impeachment something else?
 {¶ 109} "MS. DROESSLER: It is concerning the number of checks that he received. Also, I was going to get into some of the items on those checks itself that are indicated to be fraudulent by Mr. Bateman, which on these checks are the same items.
 {¶ 110} "THE COURT: Is there any dispute in this case this is a fraudulent check? These two checks are fraudulent?
 {¶ 111} "MR. LEWIS: Exhibits 1 and 2?
 {¶ 112} "THE COURT: Yeah.
 {¶ 113} "MR. LEWIS: You mean as to whether or not they were honored by Comchek or whether or not my client knew they were fraudulent?
 {¶ 114} "THE COURT: That's a different matter.
 {¶ 115} "MR. LEWIS: Sure, it is.
 {¶ 116} "THE COURT: Whether he knew it, that's your defense, isn't it?
 {¶ 117} "MR. LEWIS: Right.
 {¶ 118} "THE COURT: You're not saying these were valid checks.
 {¶ 119} "MR. LEWIS: No, not at all. What I'm saying with respect to these new items —
 {¶ 120} "THE COURT: Let me go for a second.
 {¶ 121} "MR. LEWIS: Okay.
 {¶ 122} "THE COURT: So, Miss Droessler, the fact that these others were or were not fraudulent, how does that impeach the testimony of Mr. Span?
 {¶ 123} "MS. DROESSLER: It goes to his entire credibility testifying, Judge.
 {¶ 124} "THE COURT: How?
 {¶ 125} "MS. DROESSLER: How? Like I said, he sat on the stand and he tells me he's only received five at most.
 {¶ 126} "THE COURT: I understand the number matter. And frankly I'm leaning towards allowing you to ask if he was wrong on the number of Comcheks he received.
 {¶ 127} "But beyond that, what's on those checks and whether they were fraudulent and whether there's some common scheme or method of showing his knowledge in this case, that's not being introduced to impeach him. That's being introduced as substantive evidence to show that he had the intent and he knew what was happening. "MS. DROESSLER: Well, I wasn't — as I've indicated, I was going to ask him further questions on these checks, the checks that have been offered as exhibits. As of now, I'm sure his testimony is going to change but I was going to ask those questions.
 {¶ 128} "I wanted to make sure Mr. Lewis had copies of what I just received, and then at that point in time we took a break because we did have new evidence that I wanted to use for impeachment. I'm not sure what the defendant is going to say about the specific items that are not valid on those checks.
 {¶ 129} "THE COURT: What checks.
 {¶ 130} "MS. DROESSLER: The two State's exhibits, the blown-up ones, 3 and 4.
 {¶ 131} "THE COURT: The two in question in this case.
 {¶ 132} "MS. DROESSLER: Right. I'm not sure what he'll say. I'm sure he'll change what he was going to say, but what is different on those checks is different on these checks and I think it goes — well, it goes to impeaching his knowledge. He wants to tell this jury that he had no knowledge that these were forged.
 {¶ 133} "THE COURT: Okay.
 {¶ 134} "MR. LEWIS: As of the date of —
 {¶ 135} "THE COURT: Excuse me.
 {¶ 136} "MR. LEWIS: I'm sorry, Judge.
 {¶ 137} "THE COURT: And so these other checks show what?
 {¶ 138} "MS. DROESSLER: They show similar type of invalidities on all of these checks as those checks.
 {¶ 139} "THE COURT: What if he says he never saw those checks, doesn't know what they are?
 {¶ 140} "MS. DROESSLER: Well, he can say that then.
 {¶ 141} "THE COURT: And the jury can still see them?
 {¶ 142} "MS. DROESSLER: I'm not going to admit them into evidence.
 {¶ 143} "THE COURT: Maybe — well, the Court will permit cross-examination — further cross-examination on the number of Comchek checks that Mr.Span has received at any point in 2002 since there was questioning on that. Otherwise, with the state of the evidence, the Court will not permit any substantive — and to say it's not being admitted still does not make it nonsubstantive — any substantive use of those purported checks.
 {¶ 144} "A person can be cross-examined or they can have their memory refreshed, if you will, through totally nonadmissible items. It could be a piece of string or a stone or something and you say, `Does that refresh your recollection now?' So in that sense,
 {¶ 145} if these refresh his recollection and he now either sticks to his story that no, he never — he only received five checks in all of 2002 or he changes his story, then that's the evidence before the jury. Those can't come in as substantive evidence.
 {¶ 146} "MR. LEWIS: Judge, may I be heard?
 {¶ 147} "THE COURT: Yes.
 {¶ 148} "MR. LEWIS: Judge, even allowing Ms. Droessler to parade these items in front of this jury is prejudicial. It will unduly inflame this jury because they're never going to see these items, Judge, but they're going to see, Mr. Span leafing through what appears to be most likely almost 30 pages of documents.
 {¶ 149} "THE COURT: If Mr. Span testified he only received five checks — I understand that's give or take because he said he didn't know the exact number — and he in fact, received however many that is because of the duplications, whether it's ten or 20 or 30, and doesn't that give legitimate cross-examination, to say, `How many checks did you in fact receive? Isn't it true that you received 20 checks from Comchek?'
 {¶ 150} "And if he says, `Well, I know it was more than five or six, no, I didn't receive 20, no, I didn't get them, I don't know anything about it,' why isn't that legitimate cross-examination? If he says `A' on the stand and there's proof that it's `B', why can't he be cross-examined on that.
 {¶ 151} "MR. LEWIS: Well, one, because it's not proof. We have photocopies of what appear to be — these are faxes of what appear to be photocopies. We have no evidence before us to believe that either — any of these documents are valid.
 {¶ 152} "THE COURT: And I'm making that point, that if he denies it, then they can't substantively prove it and it cannot be used to impeach him. It cannot be used for any reason. The jury will disregard it.
 {¶ 153} "It's the same as it you ask a witness on the stand, `Isn't it true you were convicted of so-and-so,' and they say, `No,' then there is no substantive proof that he was convicted of so-and-so, the jury has totally disregard that. That's an improper question.
 {¶ 154} "(Jury entering courtroom.)
 {¶ 155} ". . . .
 {¶ 156} "Q. Now, you said on cross-examination that you only remember maybe five, maybe four checks you received in 2002.
 {¶ 157} "A. I said — actually, I said I couldn't remember how many I got. But you kept saying, `Did you get two, three, four or five? Was it more than four or five?' And I said I didn't know, it could be more than that.
 {¶ 158} "Q. Oh, now you're saying it could be more than that.
 {¶ 159} "A. I said I didn't know exactly what the number was.
 {¶ 160} "Q. And that's why I was trying to ask you, and you said maybe four, maybe five.
 {¶ 161} "A. M-hum.
 {¶ 162} "Q. I want you to look at these documents and count how many are there.
 {¶ 163} "MR. LEWIS: I'm going to object, Judge.
 {¶ 164} "THE COURT: Well, let's do it this way. The objection is overruled at this time.
 {¶ 165} "Sir, just look at those and then wait for the next question. Okay?
 {¶ 166} "THE WITNESS: I've looked at them.
 {¶ 167} "THE COURT: You've looked at them.
 {¶ 168} "BY MS. DROESSLER:
 {¶ 169} "Q. Can you count how many pages are there.
 {¶ 170} "A. Yes, I know how many is there now.
 {¶ 171} "Q. Did you count them?
 {¶ 172} "A. I counted them when we was in recess.
 {¶ 173} "Q. And how many pages are here?
 {¶ 174} "MR. LEWIS: Objection.
 {¶ 175} "THE COURT: Is the question pages or is the question different checks?
 {¶ 176} "MS. DROESSLER: How many checks are — copies of checks are on these pages.
 {¶ 177} "MR. LEWIS: Objection.
 {¶ 178} "THE COURT: Just a minute. The objection is sustained.
 {¶ 179} "BY MS. DROESSLER:
 {¶ 180} "Q. How many Comcheks did you receive last year?
 {¶ 181} "A. Exactly how many? I don't know exactly, no.
 {¶ 182} "Q. And when I was asking you before on cross-examination, I said more than ten?
 {¶ 183} "A. I said I didn't know exactly how many.
 {¶ 184} "Q. But you limited us — you limited the State to five. You said no, no —
 {¶ 185} "A. I said at least five.
 {¶ 186} "Q. All right.
 {¶ 187} "A. You asked me at least five and then you said, `well, more than five?' I said I didn't exactly know.
 {¶ 188} "Q. Have you had an opportunity to refresh your recollection?
 {¶ 189} "A. Pardon?
 {¶ 190} "Q. Have you had an opportunity to refresh your recollection?
 {¶ 191} "MR. LEWIS: Objection, argumentative.
 {¶ 192} "THE COURT: Overruled.
 {¶ 193} "THE COURT: Do you know what that means?
 {¶ 194} "THE WITNESS: No.
 {¶ 195} "THE COURT: Has your memory changed at all. Once you've had a chance to look at those pieces of paper she showed you, does that change your memory —
 {¶ 196} "THE WITNESS: I know now, it's more than five.
 {¶ 197} "THE COURT: Okay."
 {¶ 198} We find no further reference in the record to the stack of documents that was presented to Span on the witness stand, or to the number of Comcheks he received
 {¶ 199} in 2002.
 {¶ 200} We find no error in the trial court's evidentiary rulings. By asking, at one point, "is the question pages or is the question different checks," the trial court alerted the jury to the possibility that the number of pages in the stack of documents being presented to Span on the witness stand and the number of checks that might be involved could be different.
 {¶ 201} As the trial court noted, because Span had previously testified concerning the number of Comcheks he had received in the past, the State was entitled to offer evidence to impeach that testimony. The State appears to have abandoned that effort when it was unsuccessful in getting Span to commit himself to some maximum number of Comcheks that he had received in the past. If Span's trial counsel had been concerned about the jury's having inferred from the size of the stack of papers being presented to Span on the witness stand that there were more checks represented therein than there actually were, trial counsel could have cleared up for the jury how many checks were actually represented in that stack of documents. Trial counsel may well have decided that the wiser course was to let the matter lie. Again, the trial court had introduced the concept that the number of pages and the number of checks represented therein might not correspond.
 B {¶ 202} At one point, Muhammed Ali Kahn, the proprietor of the Valley Street Market, who cashed a Comchek for Span on April 12, 2002 testified as follows:
 {¶ 203} "Q. I want to back up just a little bit. I want to get back to the check.
 {¶ 204} "A. Yes.
 {¶ 205} "Q. Are there numbers you're supposed to call on this type of check?
 {¶ 206} "A. Well, he kept me busy talking so much, that I could not think right. I did not think right.
 {¶ 207} "Q. I understand
 {¶ 208} "MR. LEWIS: Objection.
 {¶ 209} "THE COURT: Overruled.
 {¶ 210} "BY MS. DROESSLER:
 {¶ 211} "Q. I want you to tell the jury if — when you received the check, is there a specific number you are supposed to call?
 {¶ 212} "A. Okay. I did not notice that."
 {¶ 213} Span contends that the trial court erred by overruling his objection, because Kahn's testimony was not responsive to the question asked, and was "prejudicial to his case."
 {¶ 214} Admittedly, Kahn's response to the question, "are there numbers you're supposed to call on this type of check," was not responsive. There had earlier been testimony that a Comchek has a toll-free telephone number that a person is supposed to call to verify the check before cashing it. Kahn's testimony was in the nature of an explanation why he did not do that. He could legitimately have been asked why he did not call the toll-free number, and his explanation would have been admissible. As often happens, the witness jumped the gun by answering the next question in a logical sequence. He anticipated that after acknowledging that there are, indeed, "numbers you're supposed to call on this type of check," he would be asked to explain why he did not do that.
 {¶ 215} We conclude that the trial court did not abuse its discretion by overruling the objection, in view of the fact that this testimony would undoubtedly have been elicited by the very next question propounded to the witness. For the same reason, we conclude that any error in the trial court's ruling was not prejudicial, since this testimony could have been elicited, in any event.
 C {¶ 216} Span contends "that the State elicited improper hearsay testimony from Howard Chapman concerning payroll and employee records." Span does not cite to the part of the record reflecting this error. We have not found the error of which Span complains in the record.
 {¶ 217} Span's Second Assignment of Error is overruled.
 IV {¶ 218} Span's Third Assignment of Error is as follows:
 {¶ 219} "Appellant was deprived of a fair trial through prosecutorial misconduct."
 A {¶ 220} Span first complains because the prosecutor said, during her closing argument, that "Mr. Bateman, who works for Comdata who issues Comcheks, came in here and talked to you about how these checks are issued; and he told you, number one, right off the bat, this check is not valid because it's typed." Span did not object to this statement.
 {¶ 221} It is true, as Span notes, that this was a misstatement, because Bateman testified that he was aware of some Comcheks having been typewritten. Specifically, he testified that during his eight years with Comdata, but before 2002, when the Comcheks involved in this case were dated, he knew of one company that would prepare typewritten Comcheks before their drivers left.
 {¶ 222} We have no reason to believe that the prosecutor intentionally misstated Bateman's testimony. Her strongest point, which she argued forcefully to the jury, was the unlikelihood that an over-the-road truck driver would have been able to have typed a check for Span, without Span's ever having seen the machine used to type the check.
 {¶ 223} Not every inadvertent misstatement during closing arguments constitutes grounds for reversal. Otherwise, few convictions would survive appeal.
 B {¶ 224} Span next complains concerning the following statement made by the prosecutor during closing argument:
 {¶ 225} "MS. DROESSLER: I'm asking you to look at the evidence, listen, remember the testimony of the defendant, think about what is reasonable, what really happens in cases when you're thinking about money, this is how he's going to live. He's getting 450 dollars for, it seems like, a lot of work, that's approximately 32 dollars an hour. That's great money. If I was him, I wouldn't want to have to return it."
 {¶ 226} Span's trial counsel interposed an objection at this point, which was sustained. Span argues that the statement constitutes prosecutorial misconduct, because it expresses a personal opinion concerning Span's guilt. We do not see how this comment can be construed as constituting an expression of the prosecutor's personal opinion concerning guilt. It appears to be more of a sardonic comment concerning the implausibility of Span's testimony that he was being paid $32 an hour for helping a trucker load and unload.
 {¶ 227} In any event, Span's objection was sustained, and he sought no further relief from the trial court.
 C {¶ 228} Span next complains concerning statements made by the prosecutor during closing argument concerning Span's prior convictions. These statements, and the ensuing colloquies, transpired as follows:
 {¶ 229} "I also want you to consider his own testimony, listen to what he told you. He's been convicted twice, one time on five — I do not want to misstate this. One time for over six counts of forgery and one count of misuse of credit cards, and another time for forgery and receiving stolen property. All those, somebody else did something wrong and didn't notify him.
 {¶ 230} "MR. LEWIS: Objection.
 {¶ 231} "THE COURT: Objection sustained.
 {¶ 232} "MS. DROESSLER: Based upon Mr. Span's testimony — well, you heard his testimony. I'll let you decipher his responses. But somebody else's fault from what I got.
 {¶ 233} "MR. LEWIS: Objection.
 {¶ 234} "THE COURT: Ladies and gentlemen, there was some evidence received that the defendant was previously convicted of criminal offenses. That evidence was admitted for a limited purpose. It was not received, and you may not consider it, to prove the character of the defendant in order to show that he acted in conformity with that character.
 {¶ 235} "If you find the defendant was previously convicted, you may consider that evidence only for the purpose of testing the defendant's credibility or believability and the weight to be given to his testimony. It cannot be considered for any other purpose.
 {¶ 236} "Objection sustained.
 {¶ 237} "MS. DROESSLER: May I be heard at sidebar?
 {¶ 238} "THE COURT: No. Go ahead.
 {¶ 239} "MS. DROESSLER: He's been convicted. Once again, I don't want to restate this, but of forgery and you would think he would be a bit quicker on the uptake if you're accepting a check from Paul. Doesn't know his last name. Doesn't know how to contact him except when Paul contacts him. Gives him a check without any other receipt, any other documentation he did any work for Paul, not paying any taxes on his work, doesn't really want to answer any of my questions.
 {¶ 240} "MR. LEWIS: Objection.
 {¶ 241} "THE COURT: Overruled."
 {¶ 242} Significantly, Span never moved for a mistrial. In our view, the trial court properly sustained Span's objections, and properly overruled his last objection. The trial court also properly gave a limiting instruction to the jury, immediately upon sustaining Span's objections to the State's comments concerning his prior convictions. In the State's final allusion to his prior convictions for forgery, the State was not asserting the forbidden inference — he did it before, therefore he must have done it this time — but was, instead, asserting that Span's prior convictions for forgery should have caused him to be more suspicious of the checks he allegedly received from the driver "Paul," thereby rendering Span's version of events less credible. We agree with the trial court that this was proper argument.
 {¶ 243} Span's Third Assignment of Error is overruled.
 V {¶ 244} Span's Fourth Assignment of Error is as follows:
 {¶ 245} "The trial court's provision to the jury of an improper jury instruction deprived appellant of his constitutional right to a fair trial."
 {¶ 246} In this assignment of error, Span again refers to the trial court's misstatement, in its preliminary instructions to the jury, given before opening statements, that the fact that the indictment was filed and served on Span may not be "served" for any other purpose. Again, the trial court correctly instructed the jury in its closing instructions that the indictment could not be "considered" for any other purpose, and it was these instructions that were given to the jury in written form during their deliberations.
 {¶ 247} Span did not object to this misstatement in the trial court's preliminary jury instructions, and has therefore asserted that this is ineffective assistance of trial counsel, in connection with his First Assignment of Error.
 {¶ 248} As noted in connection with Span's First Assignment of Error, we find it unlikely in the extreme that the obvious misstatement by the trial court in its preliminary jury instructions affected the outcome of the trial. Span's Fourth Assignment of Error is overruled.
 VI {¶ 249} Span's Fifth Assignment of Error is as follows:
 {¶ 250} "The cumulative effect of the errors occurring at trial deprived appellant of a fair trial."
 {¶ 251} Span cites State v. DeMarco (1987), 31 Ohio St.3d 191, for the proposition that even if each of the errors occurring during his trial, considered in isolation, did not rise to the level of prejudicial error, the cumulative effect of all of the errors deprived him of his constitutional right to a fair trial. We have reviewed the entire transcript of Span's trial, and we have concluded that he had a fair trial. The only errors we have found are the misstatement by the trial court in its preliminary instruction to the jury, which we conclude to have been de minimus, and the trial court's overruling of one objection to an answer given by the witness Kahn, as being non-responsive, which surely would have come out in the very next question that the State would have propounded, the answer merely having been prematurely given.
 {¶ 252} The only other complaint Span makes that we have found to be legitimate was the misstatement of the prosecutor, during closing argument, concerning the testimony of Bateman, to which Span did not object. Although the State incorrectly attributed to Bateman the testimony that Comcheks are never typed, Bateman's actual testimony did discount the possibility that a check issued in 2002 would have been typed. In any event, the far more forceful aspect of the State's argument was the implausibility that an over-the-road truck driver would have been able to prepare a typed check for Span, without Span's ever having seen a machine capable of producing the typed check.
 {¶ 253} Based upon our review of the entire record of the proceedings, we conclude that Span's trial was eminently fair. Span's Fifth Assignment of Error is overruled.
 VII {¶ 254} All of Span's assignments of error having been overruled, the judgment of the trial court is Affirmed.
Brogan and Young, JJ., concur.